

**FILED**

Sep 11 2015, 8:40 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Matthew D. Anglemeyer
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Public Defender
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

R.B.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

September 11, 2015

Court of Appeals Case No.
49A02-1502-JV-96

Appeal from the Marion Superior
Court

The Honorable Marilyn A. Moores,
Judge

The Honorable Gary Chavers,
Magistrate

Cause No. 49D09-1410-JD-2399

**Najam, Judge.**

# Statement of the Case

[1] R.B. appeals his adjudication as a delinquent for dangerous possession of a firearm, as a Class A misdemeanor when committed by an adult. R.B. raises two issues for our review:

> 1. Whether his mother, T.B., had authority under the Fourth Amendment to consent to a police search of R.B.'s bedroom in T.B.'s house.
>
> 2. Whether the juvenile court abused its discretion when it admitted R.B.'s subsequent confession to law enforcement officers, which, according to R.B., was fruit of the poisonous tree following the purportedly illegal search of his bedroom.

As a matter of first impression in Indiana, we hold that it is reasonable under the Fourth Amendment for an officer to rely on the voluntary consent of a minor's parent to search the minor's bedroom inside the parent's home. Accordingly, we affirm the juvenile court's adjudication of R.B. as a delinquent.

# Facts and Procedural History

[2] At about 7:30 a.m. on September 30, 2014, Indianapolis Metropolitan Police Department Officer Sonya Daggy received a dispatch report of an attempted burglary. Officer Daggy spoke with the reporting homeowner, who gave a detailed description of the suspects, who were juveniles. The juveniles had fled south from the residence when the homeowner discovered them.

[3] A few minutes later, Officer Daggy observed three juveniles about six blocks south of the home. Those individuals matched the descriptions provided by the homeowner. Officer Daggy observed that the juveniles were wearing school uniforms but were not in school, even though "juveniles about that age are generally . . . in school . . . about that time." Tr. at 9. Officer Daggy stopped the juveniles, determined that they were supposed to be at school, and obtained their parents' contact information. R.B., who was fifteen years old, was one of the juveniles. Officer Daggy then contacted a parent for each juvenile and asked the parents to pick up their children.

[4] When T.B. arrived to pick up R.B., Officer Daggy asked her "if she had seen [R.B.] with a white laptop recently." *Id.* at 19. Officer Daggy asked T.B. this question because "there had been several burglaries in that particular neighborhood" recently, and Officer Daggy had "taken a burglary report where a white laptop had been stolen . . . approximately three weeks prior." *Id.* T.B. informed Officer Daggy that she had seen R.B. with a white laptop in the past few days but she did not know how R.B. had acquired the laptop. Accordingly, Officer Daggy asked T.B. if they could go to T.B.'s house to "locate the laptop to see if it matched" the stolen laptop. *Id.* at 20. T.B. agreed.

[5] Officer Daggy then followed T.B. and R.B. to the house. There, Officer Daggy placed R.B. in handcuffs and had him "detained . . . in the living room" with another officer. *Id.* at 24. T.B. then escorted Officer Daggy "directly to [R.B.'s] room," which T.B. then searched. *Id.* at 21. T.B. "pulled out several

watches . . . out of the dresser drawer and threw them on the floor and also pulled out a small safe and tossed that on the floor," stating that "she didn't know where . . . this stuff came from." *Id.* at 22. T.B. then lifted R.B's mattress, and when she did so Officer Daggy "heard a loud click." *Id.* at 32. When Officer Daggy heard that noise, she asked T.B. "if it was ok [for Officer Daggy to] look[] in the mattress and box spring to see what that was." *Id.* at 33. T.B. agreed. Officer Daggy then searched the area and discovered three firearms inside the box spring.

[6] The officers escorted R.B. to the police station, where he and T.B. met with Detective Jeremy Messer. Detective Messer advised R.B. and his mother of R.B.'s rights and allowed them an opportunity to consult. Thereafter, pursuant to T.B.'s advice, R.B. informed Detective Messer that he had purchased two of the three firearms "[f]or protection" and that the third belonged to a friend. *Id.* at 78.

[7] On October 1, the State alleged that R.B. was a delinquent for committing an act of dangerous possession of a firearm, as a Class A misdemeanor when committed by an adult. During the ensuing fact-finding hearing, R.B. objected to the admission of the firearms seized from his bedroom and to the admission of his confession to Detective Messer. The juvenile court overruled both objections and adjudicated R.B. a delinquent. This appeal ensued.

# Discussion and Decision

## *Standard of Review*

R.B. appeals the juvenile court's admission of evidence against him. We review the court's rulings on admissibility for an abuse of discretion and reverse only if the ruling is clearly against the logic and effect of the facts and circumstances before the court and the error affects the juvenile's substantial rights. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). However, "the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Id.*

## *Issue One: Bedroom Search*

We first consider R.B.'s argument that Officer Daggy violated his Fourth Amendment right to be free from unreasonable searches and seizures when she searched his bedroom without his consent and without a search warrant.[1] R.B.'s argument on appeal emphasizes that he had a "subjective and objective expectation of privacy" to his bedroom; that he "had a high degree of actual control and possession of his room"; that "[h]is bedroom was his own space";

---

[1] As our supreme court has noted, although the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution are textually identical, "they are analytically distinct. The Fourth Amendment analysis turns on whether the subject has a reasonable expectation of privacy, while the Section 11 analysis turns on whether the police conduct was reasonable under the totality of the circumstances." *Carpenter*, 18 N.E.2d at 1001-02. Although R.B. purports to raise an Article 1, Section 11 claim, *see* Appellant's Br. at 8-9, he does not independently analyze whether Officer Daggy's search was unreasonable under the totality of the circumstances. Accordingly, no issue under Article 1, Section 11 is properly before us.

that he "had to live at his mother's house, or commit a delinquent act"; that T.B. "gave [him] a great deal of privacy"; and that "[his] expectation of privacy . . . is one society should see as justifiable under the circumstances." Appellant's Br. at 10-12. We think these arguments miss the point.

[10] The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." As the Supreme Court of the United States has made clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Accordingly, the Fourth Amendment's warrant requirement is subject to certain exceptions. *Id.* As relevant here, "[t]he Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (citing *Illinois v. Rodriguez*, 497 U.S. 177 (1990); *United States v. Matlock*, 415 U.S. 164 (1974)).[2]

---

[2] In *Randolph*, the Court held that, when a physically present co-occupant refuses consent to a search at the same time another co-occupant gives consent, the "stated refusal . . . prevails, rendering the warrantless search unreasonable and invalid as to him." 547 U.S. at 106. R.B. does not argue that this holding should apply to him.

[11] That is what happened here. While R.B. did not consent to the search of the bedroom, his mother, the owner or renter of the house, did. There is no serious question that it is reasonable for an officer to rely on the voluntary consent of a minor's parent to search the minor's bedroom inside the parent's home.

[12] In *Randolph*, the Court held that when two adults disagree about police entering their shared home a warrantless search cannot be justified on the grounds of consent, notwithstanding the fact that one of the two adults gave consent to the entry. 547 U.S. at 114-15. In reaching that conclusion, the Court explained that, in determining the validity of consent, "great significance [is] given to widely shared social expectations." *Id.* at 111. And, on the facts before it, the Court concluded that "no recognized authority in law or social practice" entitles an officer to rely on one adult occupant's consent over another adult occupant's objection. *Id.* at 114.

[13] But the *Randolph* Court recognized limitations to its analysis. As the Court stated: "people living together [who] fall within some recognized hierarchy, like a household of parent and child," might have a "societal understanding of superior and inferior" rights to use and enjoy the property. *Id.* That is of course the case with respect to minors in their parents' homes. The "widely shared social expectations" in such circumstances are that the parents have unilateral authority over and access to the home. *See id.* at 111, 114. Accordingly, like numerous other jurisdictions, we reject R.B.'s argument that his mother's

consent does not supersede his.[3] *See, e.g.*, *Wimberly v. State*, 934 So. 2d 411, 429-30 (Ala. Crim. App. 2005); *In re D.C.*, 115 Cal. Rptr. 3d 837, 841 (Ct. App. 2010); *State v. Jones*, 475 A.2d 1087, 1094 (Conn. 1984); *Tallman v. State*, 120 So. 3d 593, 594 (Fla. Dist. Ct. App. 2013); *In re Salyer*, 358 N.E.2d 1333, 1336-37 (Ill. App. Ct. 1977); *Jacobs v. State*, 681 S.W.2d 119, 122 (Tex. Ct. App. 1984). We affirm the juvenile court's admission of the firearms seized by Officer Daggy during her search of R.B.'s bedroom.

### *Issue Two: R.B.'s Confession*

[14] R.B. next asserts that the juvenile court abused its discretion when it admitted his confession to Detective Messer. The entirety of R.B.'s argument on this issue is that his confession was "fruit of the poisonous tree"; that is, but for the purportedly illegal search of his bedroom, R.B. would not have confessed. *See* Appellant's Br. at 14. Since we hold that the search of his bedroom was clearly reasonable under the Fourth Amendment, we reject R.B.'s derivative argument that his confession was improperly admitted.

### *Conclusion*

[15] In sum, we hold that the juvenile court did not abuse its discretion in the admission of either the firearms seized from R.B.'s bedroom or his confession. Thus, we affirm R.B.'s adjudication as a delinquent.

---

[3] R.B. cites no authority in support of his position.

Affirmed.

Kirsch, J., and Barnes, J., concur.